UNITED SSTATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LINDA LOUISE CLARY a/k/a LINDA CLARY UMBERGER individually and on behalf of THE ESTATE OF JOHN ANTHONY CLARY UMBERGER (deceased), <br><br> *Plaintiffs*, <br><br> -against- <br><br> CHRISTIAN ADVOCATES SERVING EVANGELISM, INC., THE AMERICAN CENTER FOR LAW AND JUSTICE, INC., 34 EAST 61ST STREET, LLC, JAY SEKULOW, and JORDAN SEKULOW <br><br> *Defendants*. | 1:25-CV-5386-MKV <br><br><br> **AMENDED COMPLAINT** |

Plaintiff Linda Louise Clary a/k/a Linda Clary Umberger, individually and on behalf of The Estate of John Anthony Clary Umberger (deceased), by and through its undersigned counsel, as and for its Complaint against Defendants Christian Advocates Serving Evangelism, Inc., The American Center for Law and Justice, Inc., 34 East 61st Street, LLC, Jay Sekulow, and Jordan Sekulow (collectively "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.　　In the early morning hours of May 28, 2022, John Umberger ("John") was led away from a New York City bar where he had been drinking by two men. John was drugged and taken back to New York City townhouse owned by Defendants, where he was robbed and murdered. The perpetrators, who were carrying out a scheme they had used successfully on other victims as well, have been prosecuted and were recently convicted of murder and other crimes.

2.      This action is brought now to address the reprehensible conduct of Defendants at the time of John's murder and thereafter.

3.      Defendants employed John and sent him to New York City in the course of his employment. While Defendants did not themselves commit the murder, their breaches of duty and negligence put John in harm's way and, as such, were a direct and proximate cause of John's death.

4.      In addition, Defendants' shameful conduct following the crime – which was designed to protect their image and business interests rather than to get at the truth – impeded the investigation by the New York Police Department ("NYPD") and inflicted unnecessary pain and suffering on John's heirs and loved ones. Thus, John's mother brings this action on her own behalf and on behalf of John's estate to hold the Defendants accountable.

## THE PARTIES AND JURISDICTION

5.      Plaintiff Linda Lousie Clary ("Plaintiff" or "Linda") is John's mother. She is the duly appointed as the Administratrix of the Estate of John Anthony Clary Umberger (the "Estate"). She brings this action on her individual behalf and on behalf of the Estate, to seek appropriate redress. Linda is a resident of the State of Georgia and was appointed Administratrix under the laws of the State of Georgia.

6.      At all times relevant herein, John was a resident of the District of Columbia. He was an employee of Defendants up and until his death on or about May 28, 2022.

7.      On information and belief, Defendant Christian Advocates Serving Evangelism, Inc. (hereinafter "CASE") is a nonprofit corporation incorporated and having its principal place of business in the State of Tennessee.

8.     On information and belief, Defendant American Center for Law and Justice, Inc. (hereinafter "ACLJ") is a nonprofit corporation incorporated and having its principal place of business in the state of Virginia.

9.     On information and belief, Defendant 34 East 61st Street, LLC (hereinafter "34 LLC") is a limited liability company incorporated in the State of Delaware, with a sole member who resides in the State of Tennessee. 34 LLC's principal business is ownership of a townhouse located at 34 East 61st Street, New York, New York. 34 LLC is registered with the New York State Department of State to do business in New York and that registration is active as of the date of this Complaint.

10.     On information and belief, at all times relevant herein, Defendant Jay Sekulow was and is the President and Chief Executive Officer of both the ACLJ and CASE. On further information and belief, Jay Sekulow is a resident of the State of Tennessee.

11.     On information and belief, at all times relevant herein, Defendant Jordan Sekulow was and is the Executive Director of the ACLJ. On further information and belief, Jordan Sekulow is a resident of the State of Tennessee.

12.     Defendants CASE, ACLJ, and 34 LLC are referred to collectively herein as the "Corporate Defendants." Defendants Jay Sekulow and Jordan Sekulow are referred to collectively herein as the "Individual Defendants." The Corporate Defendants and the Individual Defendants are referred to collectively as the "Defendants."

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because there is a complete diversity of citizenship between the Plaintiffs and the Defendants, and because the amount in controversy exceeds $75,000. This matter was originally filed in the Supreme Court for the State of New York, and was removed to this Court by Defendants, who

asserted that it was appropriate for Federal jurisdiction. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2), because one or more of the parties resides and/or has its principal place of business in New York City, and because a substantial part of the events or omissions giving rise to the claims occurred in New York City.

**FACTUAL BACKGROUND**

**John's Employment by Defendants**

14.     John was a graduate of Georgia Tech who had worked in both the legislative and administrative branches of the federal government in Washington, D.C., at the beginning of his promising career. He was smart, kind, and ambitious. He was beloved by his friends and family. At the time of the events discussed herein, John was 33 years old.

15.     On February 10, 2022, John was hired as the Director of Diplomacy and Political Programs for Defendant ACLJ. John's office was in Washington, D.C.

16.     On information and belief, ACLJ is a purported nonprofit organization formed by Defendants Jay Sekulow and Jordan Sekulow, who are CEO and Executive Director respectively. Jay Sekulow is also the chief counsel of ACLJ.

17.     On information and belief, CASE is a purported nonprofit organization founded in 1986 by religious broadcaster, now deceased, Pat Robertson. CASE has been run since 2000 by Jay Sekulow, who is its CEO. Jay Sekulow, Jordan Sekulow, and their brother, Gary Sekulow, are the only voting members of CASE's board of directors.

18.     On information and belief, ACLJ and CASE are intertwined. ACLJ's website indicate that "American Center for Law and Justice is a d/b/a for Christian Advocates Serving Evangelism, Inc."

4

19.    Shortly after his employment commenced, John was assigned to expand the diplomatic and political activities of the ACLJ in New York City. This followed Defendants' March 26, 2022, purchase of a townhouse located at 34 East 61st Street, New York, New York, 10065 (the "Townhouse").

20.    On information and belief, the Townhouse – a five-story structure about a block and a half from Central Park – had been purchased by ACLJ, CASE, and/or the Individual Defendants for $16,500,000, with ownership running through the newly formed entity 34 LLC, which was established on or about March 25, 2022.

21.    On information and belief, 34 LLC was formed by ACLJ, CASE and the Individual Defendants.

22.    On information and belief, Defendants intended to use the Townhouse as residential accommodation for the Individual Defendants, or their invited guests, when conducting business in New York City, and to promote the diplomatic, political and religious agendas of Defendants.

23.    During the week of May 23, 2022 – almost two months after the Townhouse was purchased and three-and-a-half months after he was hired by and began working for the ACLJ in Washington, D.C. – John undertook a business trip to New York City. The purpose of the trip was to enhance ACLJ's contacts and presence in New York City, and to work on enhancing the townhouse's security, housing and meeting facilities. John arrived in New York City that day, intending to stay for about a week to work on the Townhouse.

24.    John travelled to New York by train on May 26, 2022.

25.    Even though the Townhouse had not yet been outfitted with proper security measures – or any security measures, for that matter – Defendants instructed John to stay there while performing his work in New York City. Indeed, setting up the internal structures and

facilities of the Townhouse was among the tasks assigned to John by Defendants. Thus, Defendants knew full well the security was inadequate and needed to be developed, but nonetheless required John to stay at the Townhouse while he was in New York City.

26.    On Thursday, May 26, 2022, John handwrote a note to his boss, the ACLJ's Executive Director Jordan Sekulow, expressing how much John appreciated the opportunity that Jordan and the ACLJ had provided to John. He was excited to be working for Defendants, to be visiting New York City, and to be working on the Townhouse. John had taken a reduction in pay to join ACLJ and the conversations at his hiring indicated he would have a path to partnership at the organization.

27.    John was planning to return to Washington on May 30, Memorial Day, and had purchased a train ticket for that purpose.

**The Murder of John**

28.    On Friday, May 27, 2022, after finishing the work week, John went out with friends. It was the end of a work week and the beginning of the Memorial Day Holiday weekend.

29.    As the evening of May 27 turned into the early hour of May 28, 2022, John found himself at a nightclub called The Q NYC, located at 795 Eighth Avenue, New York, New York. In or outside The Q, two gentlemen incapacitated John with the date-rape drug lidocaine and with fentanyl-laced cocaine. John was taken from the nightclub and led back to the Townhouse.

30.    The Townhouse lacked security. There were no cameras, outside or inside of the Townhouse. There were no security personnel working at the Townhouse. Indeed, except for basic locks on the doors, the Townhouse lacked any security measures whatsoever. Accordingly, the perpetrators easily were able to gain entry with John in his incapacitated state.

31.     Unimpeded, the perpetrators took John upstairs, unlocked his cell phone using its facial identification feature, and stole $25,000 from Umberger's bank accounts. The perpetrators also took the ACLJ-issued credit card that John had with him at the time.

32.     While still inside the Townhouse, the perpetrators took video footage celebrating John's incapacitation and capturing themselves frolicking in the apartment, which continued for approximately 45 minutes while John lie dead or dying. Having robbed him, the perpetrators left John alone and incapacitated in the Townhouse, where he ultimately died as a result of the substances that had been administered to him.

**The Investigation of John's Murder**

33.     Linda had near daily contact with her son and became concerned when she had not heard from John over the course of the Memorial Day weekend.

34.     Thus, Linda reached out to Jordan Sekulow on June 1, 2022, the Wednesday following the Memorial Day weekend, to see if Defendants had heard from John or knew his whereabouts. Jordan Sekulow reported that they had not heard from John since the prior Friday evening. He also indicated that he had dispatched his Property Manager to the Townhouse to check.

35.     Linda also called the NYPD and requested that they do a wellness check at the Townhouse.

36.     On information and belief, John's body was discovered at the Townhouse by an employee of Defendants, who went out into the street and found police officers.

37.     At or about 12:43 pm ET on June 1, 2022, Jay Sekulow, Jordan Sekulow, and Jacob Carringer called Linda to report that John's body had been found.

38.     On information and belief, Jacob Carringer ("Carringer") works for both CASE and ACLJ. His LinkedIn profile states that he is Chief of Security and Operations for ACLJ.

39.     In the call with Linda, Jordan Sekulow insisted there had been "no foul play," saying that "it was as if John was sitting on his bed to tie his shoes and died," thus implying that John had died from natural causes or some self-induced condition. Jordan Sekulow – who made these comments on his own behalf and on behalf of the Corporate Defendants – had no basis to eliminate the possibility of "foul play" or to make any suggestion concerning John's death. Moreover, the statements made by Jordan Sekulow indicate that he had been aware of John's death for more than a matter of minutes and had an opportunity to do some initial investigation. In short, it is apparent that Defendant knew about John's death prior to June 1, 2022, and was misrepresenting the facts intentionally to gain some sort of advantage on behalf of Defendants.

40.     Shortly after the June 1 call from Defendants, Linda received a call from NYPD to inform her of John's passing. They were surprised that she had been contacted by Jordan Sekulow and indicated to Linda that he had been told not to call her right away.

41.     On information and belief, on or about June 1, 2022, Jordan Sekulow informed other personnel at ACLJ and/or CASE that John had died of a self-induced "overdose." That false rumor began making the rounds, by text message and otherwise, spreading information that would prove to be false, and tarnishing John's image posthumously.

42.     On information and belief, Defendants in fact knew about John's death prior to June 1, 2022. Linda subsequently learned that John's company health insurance had been cancelled by Defendants on May 31, 2022, then reinstated on June 1, and then cancelled again later that day. That sequence suggests that Defendants learned of John's death by May 31 and acted to cancel his

insurance, only to realize that they should wait until it was "official," and/or were attempting to manipulate the insurance coverage to their own advantage.

43.     In further communications on June 1, 2022, Jordan Sekulow informed Linda that the law firm Brown Rudnick LLP ("Brown Rudnick") had been retained by Defendants to assist Linda and any investigation by authorities into the circumstances of John's death. Jordan Sekulow continued to insist, however, that there was no evidence that John's death had been the result of foul play, and to imply that John had voluntarily taken drugs and overdosed as a result. Plaintiffs do not know the actual date that Brown Rudnick was retained on this matter.

44.     Following the June 1 phone call, Jordan Sekulow designated Carringer to be Linda's principal contact going forward. Linda exchanged text messages with Carringer on June 1, 2022, where he pledged to have the property manager assemble, pack, and send Linda all items belonging to John located in the Townhouse or in his ACLJ office.

45.     Knowing her son very well, Linda was unconvinced by the narrative that John had died by accidental overdose. Beginning a journey that would ultimately take months, Linda did everything she could to get to the truth.

46.     On June 2, 2022, Linda asked Jordan Sekulow if his team could track credit card charges from May 27 and May 28. It was by then clear that the perpetrators had used John's credit cards to make purchases after his death. Jordan Sekulow reported: "We have done that and turned the info to police – I know we saw charges that were not his beginning on the 28th and that his credit cards were not in his wallet." Jordan Sekulow referred Linda to Carringer for further information.

47.     Concerned about the flow of information, Linda retained her own private investigator and counsel. She also planned an immediate trip to New York.

48.     On June 2, 2022, Linda emailed Jordan Sekulow and Carringer and, *inter alia*, stated:

> Dear Jim and Jacob,
>
> I wanted to let you know that several of us will be in New York arriving Saturday or Sunday for a few days. We would like some answers to what clearly is a crime scene at 34 East 61st Street and these answers need to come from NYPD and ACLJ.
>
> Additionally we have made a family decision to hire our own law firm and private investigator and will be doing a few other things.
>
> What breaks my heart in addition to John's death is the lack of transparency on the part of everyone involved so far which includes ACLJ and the NYPD.
>
> Best regards,
>
> Linda Clary

49.     In response, on June 3, 2022, Linda was contacted by Michael Bowe ("Bowe") the Chair of Litigation at Brown Rudnick, who indicated that he had been retained by ACLJ to "investigate" John's death. Bowe indicated that he would be leading an investigation along with a "chief investigator" named James Holohan ("Holohan"), who was a former Captain the New York Police Department. Linda provided Bowe and Holohan information in the hopes that they could contribute to the investigation of John's death.

50.     On June 3, 2022, Linda sent a text message to Jordan Sekulow indicating that "there are serious problems and crimes have been committed." Linda requested access to insurance information and to schedule a meeting in New York.

51.     On June 6, 2022, Linda met with Bowe, Holohan, and John Doyle ("Doyle"), another Brown Rudnick lawyer, in New York City. The meeting was supposed to be in Brown Rudnick's Times Square offices, but Linda was told that she would not be permitted entry without

social security numbers and proof of COVID vaccination for her and her guests, which included her two sisters and her boyfriend.

52.     Thus, the June 6 meeting was ultimately held in the lounge of the Knickerbocker Hotel. At the meeting, Bowe and Holohan insisted that John had been in Brooklyn at some point during the night leading up to his death. That was simply untrue, as Linda explained. Bowe and Holohan showed Linda a picture of John, clearly taken in Manhattan, which they insisted must have been taken in Brooklyn. Bowe and Holohan requested to conduct separate interviews with Linda, her sisters, and her boyfriend, before the group left for New York. Unimpressed with the conduct of Defendants' representatives, Linda and the others declined.

53.     In all, the actions of Defendants ranged from unhelpful to hostile. It appears from their conduct that Defendants were primarily interested in keeping the matter quiet, not wishing to draw public attention to the fact that they had spent $16.5 million – presumably raised from donors – to purchase New York City real estate and not wishing to draw public attention to the fact that they had employed a gay man who had been murdered. They were hoping the matter would be quickly and quietly resolved.

54.     On or about June 15, 2022, Linda received a delivery that purported to be the personal items located in John's office at ACLJ. The items were poorly packed, reflecting a shocking lack of care, and causing some of John's personal items to be broken. Linda was devastated to receive John's property in such a condition and expressed the same in a text to Jordan Sekulow, who did not respond.

55.     Among the items found in the Townhouse was a note John had written to Jordan Sekulow:

56.     Oddly, however, there was no stationery, stamps, files, or papers found in the Townhouse. All that was located was a blue journal that John had maintained, and the card he had written to Jordan. Defendants could not explain how it could be that John wrote letters at the Townhouse, including a note on personal stationary, but no unused stationery or other paper or mailing accoutrements had been located.

57.     On July 1, 2022, Linda conveyed to Jordan Sekulow a request from NYPD for any company laptop that had been issued to John.

58.     On July 13, 2022, Linda emailed Jacob Carringer at ACLJ, again inquiring as to the location of the laptop. Carringer responded: "As far as the laptop, John did have a work computer but I am unsure where it is. I have reached out to get the answer to that question."

59.     Linda later asked Defendants again, through Brown Rudnick, whether they knew the whereabouts of the laptop computer that had been issued to John and which he took to New York City.

60.     On July 21, 2022, at 6:55 am, Brown Rudnick emailed Linda and stated that the "ACLJ does not have possession of the computer and at this time it is presumed to have been taken." It later became clear that this statement was not accurate at the time it was made. Discovery

is necessary to confirm the source of the information that was conveyed by counsel. Moreover, on information and belief, Defendants also falsely reported to NYPD investigators that the laptop could not be found.

61.     The circumstances suggest that Defendants "cleaned up" the Townhouse before allowing John's body to be discovered and before NYPD could search the premises. There is no other satisfactory explanation for the lack of stationery, stamps, files, or papers at the Townhouse, or for the fact that a laptop computer was not found there, as Defendants represented.

62.     As the authorities investigated John's death, Linda was consistently stonewalled by Defendants and their representatives. Two employees in Human Resources for the ACLJ were particularly non-responsive, refusing to provide information or access.

63.      On August 10, 2022, Brown Rudnick emailed Linda's counsel, again on behalf of Defendants, stating: "We've assisted and provided all information to NYPD throughout." This statement reinforced the lie to Linda and the authorities that the laptop was missing.

64.     On September 2, 2022, Brown Rudnick finally reported, on behalf of Defendants, that in fact the laptop had not been stolen and had been in the possession of ACLJ. Defendants would not answer subsequent inquiries as to how and when the laptop came back into their possession, thus suggesting that they had it the whole time, even while they told Linda and the authorities that the laptop was missing and must have been stolen.

65.     Throughout the investigation, NYPD reported to Linda that Defendants were extremely uncooperative, and that their conduct had impeded the investigation of John's death.

**The Efforts to Access Insurance**

66.    Linda never received a formal letter from Defendants regarding John's passing. His final paycheck was carelessly deposited into one of the accounts that Defendants knew had been compromised by the perpetrators.

67.    Defendants never mentioned that John has life insurance through ACLJ's policies, but Linda pushed for more information and eventually went directly to United Healthcare to obtain the coverage. The insurer was kind and cooperative and, eventually, the life insurance was paid out.

68.    On information and belief, one or more of the Defendants maintain liability insurance policies that could have provided up to $10 million of coverage to the Estate and/or Linda. In 2022, Linda's counsel became aware of Vigilant Insurance Company Policy #3595-87-46 (the "Vigilant Policy") and Federal Insurance Company Policy # 7987-49-45 (the "Federal Policy") and sought further information. Defendants' conduct, however, has made it impossible for the Estate or Linda to obtain the benefits.

69.    Defendants reported to Linda, through her representatives, that they submitted claims on these policies, Vigilant Insurance Company Policy Claim No. 040522025707 and Federal Insurance Company Policy Claim No. 040522025699 (the "Claims"), relating to John's death at the Townhouse owned by Defendants.

70.    Linda's representatives asked Defendants for copies of the Vigilant Policy and Federal Policy themselves. On September 1, 2022, Brown Rudnick emailed Linda's counsel, on behalf of Defendants, refusing to provide them.

71.    Seeking further information, on September 14, 2022, Linda's counsel sent Defendants, through their counsel, a request for 21 categories of information and documents,

intended to further the investigation of John's death. Defendants refused to provide anything. Defendants continued to refuse to provide unredacted copies of their liability insurance policies.

72.     Instead, Linda's counsel was copied on a September 14, 2022, letter from an insurance broker, Chubb North America ("Chubb"), addressed to Carringer at CASE, disclaiming any duty to indemnify. Specifically, Chubb took the position that John's death did not constitute "property damage caused by an occurrence or advertising injury or personal injury" as defined in the Policies. To the extent John suffered "bodily injury" as defined in the Policies, Chubb asserted that there were exclusions to coverage. The letter did not attach or fully quote the relevant policies.

73.     Linda's counsel indicated that such a representation could not be understood without receiving full copies of the relevant policies. Doyle from Brown Rudnick responded, indicating that ACLJ would not provide copies. Although another Brown Rudnick partner later suggested that copies of the policies would be provided, in fact only heavily redacted copies were supplied.

74.     Linda's counsel continued efforts to pursue the claims or secure unredacted copies of the policies throughout 2023 but was rebuffed every time. He was not even provided with the provisions that the insurers were reportedly relying upon to deny coverage.

75.     By refusing to cooperate or even to supply unredacted copies of the relevant policies, Defendants impeded any effort by the Estate or Linda to pursue insurance that may have covered John while he was in New York City on business, residing at the Townhouse which had not yet been outfitted with proper security and protection.

76.     In short, Defendants made it impossible for the Estate or Linda to collect proceeds they would have been entitled to and thereby have necessitated the filing of this action.

77.     Following the filing of this action in State court, counsel for Plaintiffs received a copy of a letter dated July 2, 2025, from the law firm Goldberg Segalla, written on behalf of Employers Preferred Insurance Company ("Employers") with respect to Policy No.: EIG 2314637 0 6 (the "Employers Policy") and addressed to ACLJ. The letter purports to quote certain provisions of one Employers Policy but does not provide a full copy of that policy. Nor did Defendants provide a copy.

78.     Employers denied any coverage based on the filing of this action, because, according to Employers: (i) its policy does not cover bodily injury; (ii) the exclusive remedy of Plaintiffs is workers compensation; (iii) it does not cover actions of ACLJ following John's death; and (iv) it does not cover the insurers other than ACLJ. Plaintiffs were not provided with a copy of the Employers insurance policy and have no way to test these assertions. Plaintiffs have not been provided copies of the policies of the other Defendants and have no way to assess their coverage.

79.     Also following the filing of this action in State court, counsel for Plaintiffs received a copy of a letter dated July 15, 2025, from Munich Re with respect to Policy Number: 9JA7DO0002507-00 (the "Munich Re Policy") and addressed to CASE. The letter purports to quote certain provisions of one Munich Re Policy but does not provide a full copy of that policy. Nor did Defendants provide a copy.

80.     Munich Re denied any coverage based on the filing of this action because, according to Munich Re: (i) the matters at issue here do not constitute an "Employment Claim" as defined by the policy; (ii) CASE filed the claim under the wrong policy period, rendering that particular policy inapplicable; (iii) the policy does not cover "bodily injury, mental anguish, or death of any person;" (iv) the policy does not cover "any deliberately fraudulent act or omission

by an Insured;" (v) there is no coverage for claim by an Insured Person against an Insured; and (vi) the policy does not cover claims arising from breach of contract. Plaintiffs were not provided with a copy of the Munich Re insurance policy and have no way to test these assertions.

81.     Plaintiffs still have not received unredacted copies of the Vigilant Policy, the Federal Policy, the Employers Policy, the Munich Re Policy, or any other policy held by any Defendant that might arguably cover the events at issue. There is no just and proper purpose for continuing to withhold such policies from the Plaintiffs, and doing so is interfering with their rights to seek and obtain relief.

**The Conviction of John's Killers**

82.     Despite Defendants' failure to cooperate, the NYPD continued its investigation of John's death, ultimately determining that the perpetrators were part of a criminal conspiracy to drug and rob young men located in or outside of bars in New York City.

83.     Among other things, the perpetrators used John's cellphone – apparently accessing it through facial recognition – to steal more than $25,000 from his bank accounts. They also used credit cards issued to John and ACLJ to make unauthorized purchases, including a despicable post-murder spending spree at a Footlocker store. The gang of thugs had committed similar crimes against other men, one of which was also killed in the process.

84.     Thanks to the incredible work of the NYPD, these crimes were thoroughly investigated, leading to multiple indictments for John's murder and for crimes committed against other victims.

85.     Two individuals, Jayqwan Hamilton ("Hamilton") and Robert DeMaio ("DeMaio"), were indicted by a New York Grand Jury, tried, and convicted of crimes relating to John's death, including murder in the second degree, robbery in the first degree, and identity theft

17

in the first degree. Hamilton and DeMaio were convicted of murdering another victim and of various other crimes committed during their evil scheme.

86.    Based on the foregoing, Umberger suffered damages and ultimately death, for which Plaintiff as the Administratrix of the Estate is entitled to seek and recover monetary damages.

87.    On information and belief, in or about March 2025, Defendants sold the Townhouse for a purchase price of approximately $27.5 million. Thus, for their investment in New York City real estate, Defendants nearly doubled their money in three years, securing a profit of more than $11 million.

88.    For his efforts on the project, John lost his life.

### FIRST CAUSE OF ACTION
**(Negligence)**
**(By the Estate Against All Defendants)**

89.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

90.    Defendants had a duty of care to act reasonably with respect to the welfare, safety and well-being of John, as both an employee of Defendants and an invitee to the Townhouse owned by Defendants.

91.    Defendants breached their aforementioned duty of care owed by neglecting to maintain adequate security measures at the Townhouse and by nonetheless requiring John to use the Townhouse as his accommodation during his time in New York City.

92.    Defendants' acts, omissions and/or conduct showed a reckless or willful disregard for John's safety and well-being.

93.    As a result of Defendants' negligence, John suffered severe irreparable harm and ultimately, death.

94.    John's injuries and death were the direct and proximate cause of the carelessness, recklessness, and negligence of Defendants. But for the negligent acts of Defendants, Hamilton and DeMaio would not have been able to gain entry and leave John to die. Indeed, the trial of Hamilton and DeMaio revealed other instances where they drugged and robbed victims, but those victims survived. A distinguishing factor is the access to the Townhouse which was made available by the negligence of Defendants. Had there been a guard or doorman on premises, for example, such an individual could have intervened to assist John. Likewise, a security company monitoring the Townhouse could have summoned help. Failing to have such safeguards in place was negligence on the part of Defendants and caused his injuries and death.

95.    Because of the foregoing, the Estate is entitled to compensatory damages in an amount to be determined at trial.

96.    Because the actions of Defendants were reckless and/or showed a wanton and willful disregard for John's safety, the Estate is entitled to punitive damages in an amount to be determined at trial.

<u>**SECOND CAUSE OF ACTION**</u>
**(Negligent Infliction of Emotional Distress)**
**(By Linda Against All Defendants)**

97.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

98.    Defendants carelessly and negligently inflicted emotional distress through their wanton and reckless acts, including the following:

      a.    Discovering and concealing John's death;

b.  Representing to Linda that John's death was the result of a self-inflicted overdose and that there were no signs of "foul play;"

c.  Informing others that John's death was the result of a self-inflicted overdose, thereby attacking his reputation;

d.  Mishandling and damaging John's property before returning it to Linda;

e.  Failing to cooperate with NYPD or Linda during the investigation of John's death; and

f.  Failing to provide Linda with sufficient information and otherwise obstructing Plaintiffs' efforts to pursue insurance claims.

99.    The negligent infliction of emotional distress was egregious and actionable. Without a basis in truth, Defendants told her that her son died from an overdose and that no foul play occurred. Defendants and their agents blocked the investigation and tried to spin the matter by suggesting that John did this to himself. Defendants withheld information related to insurance policies and blocked Linda from having it at every turn. They did nothing to help when they could have. They are still blocking Linda from pursuing her rights.

100.    As a direct and proximate result of said negligent infliction of emotional distress, Linda suffered severe emotional distress, psychological distress, and mental anguish. While the loss of a son is difficult in any event, the callous and calculated actions of Defendants caused Linda additional suffering of a serious magnitude. As a result of Defendants' egregious conduct, Linda's mental anguish intensified, causing her to increase the frequency of mental health treatment, incurring additional economic cost, and causing other physical harm that will be more fully disclosed in discovery.

101.    Because of the foregoing, Linda is entitled to compensatory damages in an amount to be determined at trial.

102.    Because the actions of Defendants were reckless and/or showed a wanton and willful disregard for Linda's rights, Linda is entitled to punitive damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**(Tortious Interference With Contract)**
**(By Linda and the Estate Against All Defendants)**

103.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

104.    Plaintiffs were insureds and/or beneficiaries under one or more of the insurance policies referenced herein and, potentially, under other policies that have not been disclosed to Plaintiffs.

105.    As such, Plaintiffs had a right to recover insurance proceeds under the various insurance policies, which are valid contracts, believed to have collective limits exceeding $10 million.

106.    Defendants had knowledge of the insurance policies and of Plaintiffs' rights thereunder.

107.    Defendants intentionally interfered with Plaintiffs' rights under the policies by submitting insufficient claims, failing to dispute the rejection of those claims by the insurance broker, refusing to provide Plaintiffs with unredacted copies of the policies in place, or to even identify all of the potentially applicable policies, and otherwise refusing to assist in the pursuit of insurance claims arising from John's murder inside the Townhouse.

108.    Defendants were not parties to the insurance contracts with which they interfered. For example, Employers has a policy with ACLJ. To the extent Plaintiff's rights under that contract were interfered with by Defendants CASE, 34 LLC, Jay Sekulow and/or Jordan Sekulow, those Defendants, who were not parties to the Employers policy, would be liable for tortious interference. Similarly, Munich Re has a policy with CASE.  To the extent Plaintiff's rights under that contract were interfered with by Defendants ACLJ, 34 LLC, Jay Sekulow and/or Jordan Sekulow, those Defendants, who were not parties to the Munich Re policy, would be liable for tortious interference. Given multiple insurance policies covering different parties, the conduct of Defendants constitutes actionable tortious interference of one or more of each such policy.

109.    Defendants' interference was without justification, seeking only to protect their own interests as discussed herein, and to the detriment of the rights of Plaintiffs.

110.    As a direct and proximate result of said tortious interference with contract, Plaintiffs sustained compensatory damages in the amount of $10 million or more.

111.    Because of the foregoing, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

112.    Because the actions of Defendants were reckless and/or showed a wanton and willful disregard for their rights, Plaintiffs are entitled to punitive damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**(Defamation)**
**(By Linda Against All Defendants)**

113.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

114.    Defendants have made factually untrue statements about this lawsuit.

a. On or about May 29, 2025, counsel for Defendants stated to the publication The Independent: ""The complaint's allegations against our client are demonstrably untrue, which will become clear as the case proceeds." https://www.independent.co.uk/news/world/americas/nyc-murder-john-umberger-lgbtq-lawsuit-trump-lawyer-sekulow-b2760205.html. The statement was intended for publication and was indeed published by the Independent.

b. On or about May 30, 2025, counsel for Defendants stated to the publication Newsweek: "The complaint's allegations against ACLJ are demonstrably untrue, which will become clear as the case proceeds." https://www.newsweek.com/donald-trump-former-lawyer-accused-covering-murder-2078940. The statement was intended for publication and was indeed published by Newsweek.

115.    On information and belief, counsel for Defendants was authorized to make these statements on their behalf.

116.    The statements clearly refer to Linda, as she is the living Plaintiff who brought the lawsuit.

117.    The statements were false when made, as the allegations in the initial complaint were indeed true. The statements on behalf of Defendants were intended to and do paint Linda as a liar, to communicate that message broadly, and to pressure her to drop the lawsuit.

118.    Calling someone a liar and asserting that they have filed false claims in the courts in an effort to obtain money constitutes defamation per se.

119.    While counsel publicly stated that the supposed untruth of the allegations would be "become clear as the case proceeds," Defendants instead seek to dismiss this case before the facts

can be fully discovered, explored, and vetted in this lawsuit. Defendants have no intention of making anything clear.

120.    Because the statements were made to the press, and not in the lawsuit itself, they are not shielded by absolute privilege or even by a qualified privilege. Even if the statements were deemed to be potentially covered by a qualified privilege, they were made with knowledge of falsity or with reckless disregard of the truth, as Defendants know that the allegations in the initial complaint were factually accurate.

121.    As a direct and proximate result of said tortious interference with contract, Linda sustained compensatory damages in the amount of $1 million or more.

122.    By reason of the foregoing, Linda is entitled to compensatory damages in an amount to be determined at trial.

123.    Because the actions of Defendants were reckless and/or showed a wanton and willful disregard for their rights, Linda is entitled to punitive damages in an amount to be determined at trial.

## **<u>JURY DEMAND</u>**

124.    Plaintiffs hereby demand a trial by jury of any issue of fact triable of right by a jury.


**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants as follows:

A.  On the First Cause of action, judgment in favor of the Estate against the Defendants and compensatory damages of $10 million or more, or in an amount to be determined at trial, and punitive damages;

B.  On the Second Cause of Action, judgment in favor of Linda against the Defendants, compensatory damages of $3 million or more, or in an amount to be determined at trial, and punitive damages;

C.  On the Third Cause of Action, judgment in favor of Linda and the Estate against the Defendants, compensatory damages of $10 million or more, or in an amount to be determined at trial, and punitive damages;

D.  On the Fourth Cause of Action, judgment in favor of Linda against the Defendants, compensatory damages of $1 million or more, or in an amount to be determined at trial, and punitive damages; and

E.  On all Causes of Action, interest, attorney's fees, costs and disbursements and such other and further relief as this Court deems just, equitable and proper.

Dated: New York, New York
      August 28, 2025

          **TARTER KRINSKY & DROGIN LLP**
          *Attorneys for Plaintiff*

      By:_____
          Richard C. Schoenstein
          1350 Broadway
          New York, New York 10018
          Tel.: (212) 216-1139
          Facsimile: (212) 216-8001
          Email: rschoenstein@tarterkrinsky.com