**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LINDA LOUISE CLARY a/k/a LINDA CLARY UMBERGER individually and on behalf of THE ESTATE OF JOHN ANTHONY CLARY UMBERGER (deceased),<br><br>      *Plaintiff,*<br><br>  -against-<br><br>CHRISTIAN ADVOCATES SERVING EVANGELISM, INC., THE AMERICAN CENTER FOR LAW AND JUSTICE, INC., 34 EAST 61ST STREET, LLC, JAY SEKULOW, and JORDAN SEKULOW,<br><br>      *Defendants.* | Case No. 1:25-cv-05386-MKV |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AND TO STRIKE**
**ALLEGATIONS FROM THE AMENDED COMPLAINT**

        **TARTER KRINSKY & DROGIN LLP**
        *Attorneys for Plaintiff*
        Richard C. Schoenstein
        1350 Broadway
        New York, New York 10018
        Tel.: (212) 216-1139
        Facsimile: (212) 216-8001
        Email: rschoenstein@tarterkrinsky.com

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................... 2

LEGAL STANDARD ............................................................................................. 9

ARGUMENT ......................................................................................................... 9

    I.     The Amended Complaint States a Plausible Claim for Negligence ...................... 9

    II.    The Amended Complaint States a Plausible Claim for Negligent
          Infliction of Emotional Distress .................................................................. 12

    III.   The Amended Complaint States a Plausible Claim for Tortious
          Interference with Contract ......................................................................... 15

    IV.   The Amended Complaint States a Plausible Claim for Defamation .................... 18

          A.   New York's Anti-SLAPP Law Does Not Bar Plaintiff's Defamation
              Claim ............................................................................................ 18

          B.   Plaintiff Alleges Actionable Defamation ....................................... 20

    V.    Defendants' Motion to Strike Should Also Be Denied ........................................ 24

CONCLUSION .................................................................................................... 25

CERTIFICATION OF SERVICE ......................................................................... 26

CERTIFICATION OF COMPLIANCE ................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albert v. Loksen*,
    239 F3d 256 (2d Cir. 2001)........................................................................................23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................... *passim*

*Batista v. City of New York*,
    108 A.D.3d 484 (1st Dep't 2013) ............................................................................11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...........................................................................................1, 24

*Berryman v. Reading Intl., Inc.*,
    763 F. Supp. 3d 596 (S.D.N.Y. 2025)....................................................................24

*Beter v. Baughman*,
    24-CV-0079 (GHW) (RFT), 2024 WL 4252036 (S.D.N.Y. Sept. 5, 2024) ......................13, 14

*Brian v. Richardson*,
    87 N.Y.2d 46 (1995) ...............................................................................................21

*Campoverde v. Sony Pictures Ent., Inc.*,
    2002 WL 31163804 (S.D.N.Y. Sept. 30, 2002)......................................................14

*Carney v. Boston Market*,
    2018 WL 6698444 (S.D.N.Y. Dec. 20, 2018) ..................................................14, 15

*Debary v. Harrah's Operating Co., Inc.*,
    465 F. Supp. 2d 250 (S.D.N.Y. 2006), *aff'd sub nom. Catskill Dev., L.L.C. v.*
    *Park Place Entertainment Corp.*, 547 F.3d 115 (2d Cir. 2008)...............................16

*Eastman Kodak Co. v. Henry Bath LLC*,
    936 F.3d 86 (2d Cir. 2019)...................................................................................2, 9

*Florman v. City of New York*,
    293 A.D.2d 120 (1st Dep't 2002) ...........................................................................11

*In re Fosamax Products Liab. Litig.*,
    742 F. Supp. 2d 460 (S.D.N.Y. 2010)....................................................................12

*Glennon v. Star Co.*,
    130 A.D. 491 (1st Dep't 1909) ...............................................................................11

*Gottwald v. Sebert*,
    193 A.D.3d 573 (1st Dep't 2021) ...........................................................................21

*Harris v. New York City Hous. Auth.*,
    187 A.D.2d 362 (1st Dep't 1992) ...........................................................................12

*Henry-Lee v. City of New York*,
    746 F. Supp. 2d 546 (S.D.N.Y. 2010)....................................................................12

*Impulsive Music v. Pomodoro Grill, Inc.*,
    2008 WL 4998474 (W.D.N.Y. Nov. 19, 2008) .......................................................24

*Kamdem-Ouaffo v Balchem Corp.*,
    2018 WL 4386092 (S.D.N.Y. Sept. 14, 2018)........................................................20

*Kmiotek v. Sachem Cent. School Dist.*,
    176 A.D.3d 1063 (2d Dep't 2019) ..........................................................................13

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.*,
    528 F. Supp. 2d 303 (S.D.N.Y. 2007).....................................................................13

*Novikova v. Greenbriar Owners Corp.*,
    258 A.D.2d 149 (2d Dep't 1999) ............................................................................11

*Palin v. New York Times Co.*,
    940 F.3d 804 (2d Cir. 2019)...................................................................................24

*Pasternack v. Lab. Corp. of Am.*,
    892 F. Supp. 2d 540 (S.D.N.Y. 2012).......................................................................9

*Scurry v. New York City Hous. Auth.*,
    39 N.Y.3d 443 (2023) ......................................................................................11, 12

*Sprecher v. Thibodeau*,
    148 A.D.3d 654 (1st Dep't 2017) ......................................................................21, 22

*Symquest Group, Inc. v. Canon U.S.A., Inc.*,
    186 F. Supp. 3d 257 (E.D.N.Y. 2016) ....................................................................15

*Tarter v. Schildkraut*,
    151 A.D.2d 414 (1989) ....................................................................................11, 12

*Zervos v. Trump*,
    171 A.D.3d 110 (1st Dep't 2019) ...........................................................................22

**Statutes**

N.Y. Civ. Rights Law § 70-a (1)(a)-(c) ...........................................................................19

N.Y. Civ. Rights Law § 76-a ........................................................................................................19

New York Penal Law § 175.35...............................................................................................23, 24

**Other Authorities**

Fed. R. Civ. P. Rule 8(a)(2) ..........................................................................................................9

Fed. R. Civ. P. Rule 12(b)(6) ...................................................................................1, 2, 15, 18

Fed. R. Civ. P. Rule 12(f) ......................................................................................................24, 25

Plaintiff Linda Louise Clary a/k/a Linda Clary Umberger, individually and on behalf of The Estate of John Anthony Clary Umberger (deceased) ("Plaintiff") respectfully submits this memorandum of law in opposition to the "Motion to Dismiss for Failure to State a Claim and to Strike Allegations from the Amended Complaint" ("Defendants' Motion" or "Def. Mot.") filed by Defendants Christian Advocates Serving Evangelism, Inc. ("CASE"), The American Center for Law and Justice, Inc. ("ACLJ"), 34 East 61st Street, LLC ("34 LLC"), Jay Sekulow, and Jordan Sekulow (collectively, "Defendants"), and states as follows:

## PRELIMINARY STATEMENT

Defendants seek to evade scrutiny and accountability for their own misconduct surrounding and following the tragic death of John Anthony Clary Umberger ("John") by distorting Plaintiff's well-pleaded allegations and applying standards inconsistent with Federal Rules of Civil Procedure ("Fed. R. Civ. P.") Rule 12(b)(6). At this stage, the Court must accept Plaintiff's allegations as true and draw all reasonable inferences in Plaintiff's favor. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The Amended Complaint, filed on August 28, 2025 (the "Amended Complaint" or "Am. Compl."), alleges that Defendants employed John, sent him to New York City for work, and required him to stay in Defendants' townhouse despite knowing it had not been outfitted with security measures. The Amended Complaint details that, by failing to implement safeguards at the property, yet nonetheless compelling John to stay there (notably, to work on enhancing the very security the property lacked), Defendants breached their duty of care and enabled the circumstances leading to John's death. The Amended Complaint further alleges Defendants engaged in a pattern of callous, obstructive, and shameful post-mortem misconduct—including concealing information, misrepresenting the circumstances of John's death to Plaintiff and others,

mishandling and damaging John's property before returning the property to Plaintiff, failing to cooperate with either NYPD or Plaintiff during the investigation of John's death, interfering with Plaintiff's rights under insurance policies, and publicly painting Plaintiff as a liar to the press—which has not only exacerbated the harm and emotional suffering to Plaintiff, but has also demonstrated an utter disregard for the dignity of the deceased and for Plaintiff, John's grieving mother.

Defendants' Motion improperly asks this Court to resolve factual disputes and draw inferences in *their* favor. Defendants' arguments, inferences, and interpretation of the facts, however, disregard that, in assessing motions to dismiss for failure to state a claim, it is a court's obligation to interpret the allegations in the light most favorable to Plaintiff, drawing reasonable inferences in Plaintiff's favor. *See Eastman Kodak Co. v. Henry Bath LLC,* 936 F.3d 86, 93 (2d Cir. 2019). Against this backdrop, Defendants' motion to dismiss under Fed. R. Civ. P. Rule 12(b)(6) fails, as each of Plaintiff's causes of action—negligence, negligent infliction of emotional distress, tortious interference with contract, and defamation—are supported by detailed factual allegations that more than plausibly state claims for relief. The matters raised by Defendants are nothing more than triable issues of fact, which require resolution before a jury.  For these reasons, and those discussed below, Defendants' Motion should be denied in its entirety.

## **FACTUAL BACKGROUND**

The factual background relevant to this memorandum of law in opposition to Defendants' Motion is set forth in greater detail in the Amended Complaint and is summarized below for reference.

John was a graduate of Georgia Tech who had worked in multiple branches of the federal government in Washington, D.C., at the beginning of his promising career. *See* Am. Compl. ¶ 14.

He was smart, kind, ambitious, and beloved by his friends and family. *Id.* At the time of his death, John was only 33 years old. *Id.*

On February 10, 2022, John was hired as the Director of Diplomacy and Political Programs for Defendant ACLJ. *See* Am. Compl. ¶ 15. John's office was in Washington, D.C. *Id.* Shortly thereafter, John was assigned to expand the activities of the ACLJ in New York City. *See* Am. Compl. ¶ 19. This followed Defendants' March 26, 2022, purchase of a townhouse at 34 East 61st Street, New York, New York, 10065 (the "Townhouse"), a five-story building very close to Central Park, which was purchased by Defendants for $16,500,000. *Id*; Am. Compl. ¶¶ 20-21.

During the week of May 23, 2022, shortly after the Townhouse purchase and John's commencement of employment, John undertook a business trip to New York City. *See* Am. Compl. ¶ 23. The purpose of the trip was to enhance ACLJ's contacts and presence in New York City, and to work on enhancing the Townhouse's security, housing and meeting facilities. *Id.* Even though the Townhouse had not yet been outfitted with proper security measures—or any security measures, for that matter—Defendants instructed John to stay there, while he was assigned to set up the internal structures and facilities. *See* Am. Compl. ¶ 25.

As John expressed in a May 26, 2022, handwritten note to his boss, the ACLJ's Executive Director Jordan Sekulow, he was appreciative and excited about his future. *See* Am. Compl. ¶ 26.

On Friday, May 27, 2022, John began the Memorial Day Holiday weekend by going out with friends. *See* Am. Compl. ¶ 28. As the evening turned into the early hours of May 28, 2022, John found himself at a nightclub called The Q NYC, located at 795 Eighth Avenue, New York, New York. *See* Am. Compl. ¶ 29.  In or outside The Q, two gentlemen incapacitated John with the date-rape drug lidocaine and with fentanyl-laced cocaine. *Id.* John was taken from the nightclub and led back to the Townhouse. *Id.*

The Townhouse lacked security. *See* Am. Compl. ¶ 30.  There were no cameras, outside or inside of the Townhouse. *Id.* There were no security personnel working at the Townhouse. *Id.* Accordingly, the perpetrators easily were able to gain entry with John in his incapacitated state. *Id.*

Unimpeded, the perpetrators took John upstairs, unlocked his cell phone using its facial identification feature, and stole $25,000 from Umberger's bank accounts. *See* Am. Compl. ¶ 31. The perpetrators also took the ACLJ-issued credit card that John had with him at the time. *Id.* While still inside the Townhouse, the perpetrators took video footage celebrating John's incapacitation and capturing themselves frolicking in the apartment, which continued for approximately 45 minutes while John lie dead or dying. *See* Am. Compl. ¶ 32.  Having robbed him, the perpetrators left John alone and incapacitated in the Townhouse, where he ultimately died as a result of the substances that had been administered to him. *Id.*

Plaintiff had near daily contact with her son and became concerned when she had not heard from him. *See* Am. Compl. ¶ 33. Thus, Plaintiff reached out to Jordan Sekulow on June 1, 2022, the Wednesday following the Memorial Day weekend. *See* Am. Compl. ¶ 34.  Jordan Sekulow reported that they had not heard from John since the prior Friday evening. *Id.* He also indicated that he had dispatched his Property Manager to the Townhouse to check. *Id.* Plaintiff also called the NYPD and requested that they do a wellness check at the Townhouse. *See* Am. Compl. ¶ 35.

On information and belief, John's body was discovered at the Townhouse by an employee of Defendants, who went out into the street and found police officers. *See* Am. Compl. ¶ 36.  At or about 12:43 pm ET on June 1, 2022, Jay Sekulow, Jordan Sekulow, and Jacob Carringer called Plaintiff to report that John's body had been found. *See* Am. Compl. ¶ 37.  In the call with Plaintiff, Jordan Sekulow insisted there had been "no foul play," saying that "it was as if John was sitting

on his bed to tie his shoes and died," thus implying that John had died from natural causes or some self-induced condition. *See* Am. Compl. ¶ 39.  Jordan Sekulow—who made these comments on his own behalf and on behalf of CASE, ACLJ, and 34 LLC (collectively, the "Corporate Defendants")—had no basis to eliminate the possibility of "foul play" or to make any suggestion concerning John's death. *Id.* Moreover, the statements made by Jordan Sekulow indicate that he had been aware of John's death for more than a matter of minutes and had an opportunity to do some initial investigation. *Id.* In short, it is apparent that Defendants knew about John's death prior to June 1, 2022, and was misrepresenting the facts intentionally to gain some sort of advantage on behalf of Defendants. *Id.* Shortly after the June 1 call from Defendants, Plaintiff received a call from NYPD to inform her of John's passing. *See* Am. Compl. ¶ 40.  They were surprised that she had been contacted by Jordan Sekulow and indicated to Plaintiff that he had been told not to call her right away. *Id.*

On information and belief, on or about June 1, 2022, Jordan Sekulow informed other personnel at ACLJ and/or CASE that John had died of a self-induced "overdose." *See* Am. Compl. ¶ 41. That false rumor began making the rounds, by text message and otherwise, spreading information that would prove to be false, and tarnishing John's image posthumously. *Id.* On information and belief, Defendants in fact knew about John's death prior to June 1, 2022. *See* Am. Compl. ¶ 42.  Plaintiff subsequently learned that ***John's company health insurance had been cancelled by Defendants on May 31, 2022, then reinstated on June 1, and then cancelled again later that day***. *Id.* That sequence suggests that Defendants learned of John's death by May 31 and acted to cancel his insurance, only to realize that they should wait until it was "official," and/or were attempting to manipulate the insurance coverage to their own advantage. *Id.*

In sum, the actions of Defendants following John's death ranged from unhelpful to hostile. *See* Am. Compl. ¶ 53. It appears from their conduct that Defendants were primarily interested in keeping the matter quiet, not wishing to draw public attention to the fact that they had spent $16.5 million—presumably raised from donors—to purchase New York City real estate and not wishing to draw public attention to the fact that they had employed a gay man who had been murdered. *Id.* They were hoping the matter would be quickly and quietly resolved. *Id.*

On or about June 15, 2022, Plaintiff received a delivery that purported to be the personal items located in John's office at ACLJ. *See* Am. Compl. ¶ 54. The items were poorly packed and some were broken, reflecting a shocking lack of care. *Id.* Plaintiff was devastated and expressed the same in a text to Jordan Sekulow, who did not respond. *Id.* Additionally, as the authorities investigated John's death, Plaintiff was consistently stonewalled by Defendants and their representatives. *See* Am. Compl. ¶ 62. Two employees in Human Resources for the ACLJ were particularly non-responsive, refusing to provide information or access. *Id.* Throughout the investigation, NYPD reported to Plaintiff that Defendants were extremely uncooperative, and that their conduct had impeded the investigation of John's death. *See* Am. Compl. ¶ 65.

Plaintiff never received a formal letter from Defendants regarding John's passing. *See* Am. Compl. ¶ 66. His final paycheck was carelessly deposited into one of the accounts that Defendants knew had been compromised by the perpetrators. *Id.* Moreover, Defendants never mentioned that John had life insurance through ACLJ's policies, but Plaintiff pushed for more information and eventually went directly to United Healthcare to obtain the coverage. *See* Am. Compl. ¶ 67. The insurer was kind and cooperative and, eventually, the life insurance was paid out. *Id.*

On information and belief, one or more of the Defendants maintain liability insurance policies that could have provided up to $10 million of coverage to the Estate of John and/or

Plaintiff individually. *See* Am. Compl. ¶ 68. In 2022, Plaintiff's counsel became aware of Vigilant Insurance Company Policy #3595-87-46 (the "Vigilant Policy") and Federal Insurance Company Policy # 7987-49-45 (the "Federal Policy") and sought further information. *Id.* Defendants' conduct, however, has made it impossible for the Estate of John or Plaintiff individually to obtain the benefits. *Id.* Defendants reported to Plaintiff, through her representatives, that they submitted claims on these policies. *See* Am. Compl. ¶ 69. Plaintiff's representatives asked Defendants for copies of the Vigilant Policy and Federal Policy themselves. *See* Am. Compl. ¶ 70. On September 1, 2022, Brown Rudnick (the law firm retained by Defendants) emailed Plaintiff's counsel, on behalf of Defendants, refusing to provide them. *Id.* Seeking further information, on September 14, 2022, Plaintiff's counsel sent Defendants, through their counsel, a request for 21 categories of information and documents, intended to further the investigation of John's death. *See* Am. Compl. ¶ 71. Defendants refused to provide anything. *Id.* Instead, Plaintiff's counsel was copied on a September 14, 2022, letter from an insurance broker, Chubb North America ("Chubb"), addressed to Jacob Carringer at CASE, disclaiming any duty to indemnify. *See* Am. Compl. ¶ 72.

Plaintiff's counsel continued efforts to pursue the claims or secure unredacted copies of the policies throughout 2023 but was rebuffed every time. *See* Am. Compl. ¶ 74. He was not even provided with the provisions that the insurers were reportedly relying upon to deny coverage. *Id.* By refusing to cooperate or even to supply unredacted copies of the relevant policies, Defendants impeded any effort by the Estate of John and/or Plaintiff individually to pursue insurance that may have covered John while he was in New York City on business, residing at the Townhouse which had not yet been outfitted with proper security and protection. *See* Am. Compl. ¶ 74. In short, Defendants made it impossible for the Estate of John and/or Plaintiff individually to collect

proceeds they would have been entitled to and thereby have necessitated the filing of this action. *See* Am. Compl. ¶ 76.

Following the filing of this action in State court, counsel for Plaintiff received a copy of a letter from Employers Preferred Insurance Company ("Employers") with respect to Policy No.: EIG 231463706 (the "Employers Policy") and addressed to ACLJ. *See* Am. Compl. ¶ 77. The letter purports to quote certain provisions of one Employers Policy but does not provide a full copy of that policy. *Id.*  Nor did Defendants provide a copy. *Id.* Employers denied any coverage based on the filing of this action. *See* Am. Compl. ¶ 78.

Also following the filing of this action in State court, counsel for Plaintiff received a copy of a letter dated July 15, 2025, from Munich Re with respect to Policy Number: 9JA7DO0002507-00 (the "Munich Re Policy") and addressed to CASE. *See* Am. Compl. ¶ 79. The letter purports to quote certain provisions of one Munich Re Policy but does not provide a full copy of that policy. *Id.*  Nor did Defendants provide a copy. *Id.*  Munich Re denied any coverage based on the filing of this action. *See* Am. Compl. ¶ 80. Plaintiff still has not received unredacted copies of the Vigilant Policy, the Federal Policy, the Employers Policy, the Munich Re Policy, or any other policy held by any of the Defendants that might arguably cover the events at issue, and such withholding is interfering with Plaintiff's rights to seek and obtain relief. *See* Am. Compl. ¶ 81.

Despite Defendants' failure to cooperate, the NYPD continued its investigation, and two men were ultimately convicted for John's murder and for crimes committed against other victims. *See* Am. Compl. ¶¶ 82-85. On information and belief, in or about March 2025, Defendants sold the Townhouse for a purchase price of approximately $27.5 million. *See* Am. Compl. ¶ 87. Thus, for their investment in New York City real estate, Defendants nearly doubled their money in three

years, securing a profit of more than $11 million. *Id.* For his efforts on the project, John lost his life. *See* Am. Compl. ¶ 88.

## LEGAL STANDARD

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. Rule 8(a)(2). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). A claim has "facial plausibility" when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* "In assessing . . . motions to dismiss complaints for failure to state a claim, it is a court's obligation to view the evidence and interpret the allegations in the light most favorable to the plaintiff, drawing reasonable inferences in their favor." *Eastman Kodak Co.,* 936 F.3d at 93.

## ARGUMENT

## I.    The Amended Complaint States a Plausible Claim for Negligence

The Amended Complaint sufficiently states a claim for negligence against Defendants. To state a cause of action for negligence under New York law, Plaintiff must allege: (1) the existence of a duty on Defendants' part as to Plaintiff; (2) a breach of this duty; and (3) injury to Plaintiff as a result thereof. *See Pasternack v. Lab. Corp. of Am.*, 892 F. Supp. 2d 540, 552 (S.D.N.Y. 2012).

The allegations in the Amended Complaint plainly satisfy these elements. As detailed in the Amended Complaint, Defendants employed John and sent him to New York City. *See* Am. Compl., ¶¶ 15, 19. The purpose of the trip included the assigned work and task of setting up the internal structures and facilities and enhancing the security of the Townhouse. *See* Am. Compl. ¶ 23. Defendants knew their Townhouse had not been outfitted with security measures and that

9

security needed to be developed but nonetheless instructed John to stay at the Townhouse while performing his work in New York City. *See* Am. Compl. ¶ 25.

Defendants argue that Plaintiff concedes their compliance with the duty of reasonable care. Not so. Plaintiff alleged in the Amended Complaint that Defendants had a duty of care to act reasonably with respect to the welfare, safety and well-being of John as Defendants' employee and invitee to Defendants' Townhouse; Defendants breached their duty by neglecting to maintain adequate security measures at the Townhouse and by nonetheless requiring John to use the Townhouse as his accommodation during his time in New York City; and John suffered injury and death as a result thereof. *See* Am. Compl., ¶¶ 90-93; *cf.* Def. Mot., Section I (B).

Plaintiff additionally alleges that John's injuries and death were the direct and proximate cause of the carelessness, recklessness, and negligence of Defendants. *See* Am. Compl. ¶ 94. But for the negligent acts of Defendants, the individuals who murdered John would not have been able to gain entry and leave John to die. *Id.* The Amended Complaint alleges that the trial of John's murderers revealed other instances where they drugged and robbed victims, but those victims survived. *Id.* A distinguishing factor is the access to the Townhouse which was made available by the negligence of Defendants. *Id.* Had there been a guard or doorman on premises, for example, such an individual could have intervened to assist John. *Id.* Likewise, a security company monitoring the Townhouse could have summoned help. *Id.* Failing to have such safeguards in place was negligence on the part of Defendants and caused his injuries and death. *Id.*

Accepting these allegations as true and drawing all reasonable inferences in Plaintiff's favor, which this Court must do, Plaintiff has adequately pleaded a negligence claim.

Defendants' argument that New York law imposes no duty beyond "rudimentary security" and that "landowners do not have a duty to provide security measures beyond working locks on

external doors" is off point. Defendants, notably, rely on factually dissimilar cases brought by tenants or guests. *See Scurry v. New York City Hous. Auth.*, 39 N.Y.3d 443, 449 (2023) (deceased tenant against the owner and operator of public housing); *Batista v. City of New York*, 108 A.D.3d 484, 487 (1st Dep't 2013) (premises visitor against the landlord); *Tarter v. Schildkraut,* 151 A.D.2d 414, 415 (1989) (tenant against a landlord); *Novikova v. Greenbriar Owners Corp.,* 258 A.D.2d 149, 155 (2d Dep't 1999) (deceased visitor and guest of a tenant against a condominium apartment building owner); *Florman v. City of New York,* 293 A.D.2d 120, 124 (1st Dep't 2002) (pedestrian standing in a parking field against the producer of a large-scale concert held in a public park). The negligence claim here, however, involves an employee required by an employer to stay in premises in which the employee is to do work required of the employee—a much different situation from those addressed in any of Defendants' cited cases. *See Glennon v. Star Co.*, 130 A.D. 491, 494 (1st Dep't 1909) (holding that submission of the negligence case to the jury was justified, and that "[i]t is one of the fundamental principles applicable to the relation between employer and employe that the employer is charged with the positive duty of furnishing to his employes a safe and proper place in which they are to do the work required of them [and] [t]his duty extends to the premises in which the employes are put to work.").

Moreover, Defendants again misstate the Amended Complaint's allegations by suggesting a concession that John was given "a lethal dose of various drugs" before arriving back at the Townhouse, absolving them of liability. This reading disregards the allegations that the inadequate security which allowed the murderers to enter the Townhouse facilitated and proximately caused John's death. *See* Am. Compl. ¶ 94. Whether "extra security measures" would have been immaterial is a factual matter for a jury. The allegations in the Amended Complaint indicate that the perpetrators' ability to exploit the Townhouse's vulnerabilities was directly connected to the

lack of safeguards that should have prevented unauthorized entry. Defendants' hypotheticals about John dying "elsewhere" do not negate proximate cause. The Amended Complaint plausibly alleges that the lack of security at the Townhouse was a substantial factor that enabled the fatal outcome. At this stage, Plaintiff is not required to prove proximate cause but is required only to allege facts that make it plausible, which Plaintiff has done.

Furthermore, questions concerning what is foreseeable may be the subject of varying inferences, as is the question of negligence itself, and such issues generally are for the fact finder to resolve. *Scurry*, 39 N.Y.3d at 454.[1] Here, the Amended Complaint alleges that the Townhouse lacked security measures and that Defendants were aware of its unsafe condition. *See* Am. Compl. ¶ 25. Such issues of fact highlighted by Defendants require resolution before a jury. *See, e.g., In re Fosamax Products Liab. Litig.*, 742 F. Supp. 2d 460, 473 (S.D.N.Y. 2010) ("The proximate cause inquiry typically is an issue of fact for the jury."). Accordingly, the Court should not dismiss Plaintiff's adequately pleaded negligence claim.

## II.   The Amended Complaint States a Plausible Claim for Negligent Infliction of Emotional Distress

The Amended Complaint sufficiently states a claim for negligent infliction of emotional distress. To state a negligent infliction of emotional distress claim ("NIED") under New York law, Plaintiff must allege: (1) extreme and outrageous conduct, (2) a causal connection between the

---

[1] Defendants, again, rely on factually inapposite cases in an attempt to deprive Plaintiff of her right to have a jury determine these plainly triable issues of fact. *Cf.* Def. Mot., Section I (C), pp. 10-11; *see Henry-Lee v. City of New York*, 746 F. Supp. 2d 546 (S.D.N.Y. 2010) (holding proprietor of bar did not have a duty, under New York law relating to premises liability, to provide security capable of preventing the death of bar patron who was shot and killed by an off-duty city police sergeant after patron had stabbed another off-duty city police officer, in absence of any evidence of prior criminal activities on the bar's premises and in the area that were sufficiently similar to the incident involving the patron); *Tarter*, 151 A.D.2d at 414 (holding jury could not properly have inferred that reasonable security measures would have deterred act of violence when the victim's stalker and jilted lover—intent on harming the victim—followed her into a vestibule (with an intercom system for visitors to summon residents) of apartment building where she resided and shot her with shotgun); *Harris v. New York City Hous. Auth.*, 187 A.D.2d 362 (1st Dep't 1992) (dismissing complaint brought by infant tenants in housing project owned and managed by defendant, when they were innocent bystanders shot outside by an unknown assailant with machine gun that had been concealed in one of projects' buildings).

conduct and the injury, and (3) severe emotional distress. *See Beter v. Baughman*, 24-CV-0079 (GHW) (RFT), 2024 WL 4252036, at *7 (S.D.N.Y. Sept. 5, 2024). Physical injury is not a necessary component of a cause of action for NIED. *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.*, 528 F. Supp. 2d 303, 309 (S.D.N.Y. 2007). Additionally, a plaintiff must plead facts making out one of three theories: (1) a bystander theory, (2) a direct duty theory, or (3) a special circumstances theory. *See Beter,* 2024 WL 4252036, at *7.

The allegations in the Amended Complaint satisfy these elements. Defendants carelessly and negligently inflicted emotional distress through their wanton and reckless acts, including but not limited to concealing John's death, representing to Plaintiff that John's death was the result of a self-inflicted overdose and that there were no signs of "foul play," informing others that John's death was the result of a self-inflicted overdose, mishandling and damaging John's property before returning the property to Plaintiff, failing to cooperate with NYPD or Plaintiff during the investigation of John's death, and failing to provide Plaintiff with sufficient information to pursue insurance claims. *See* Am. Compl., ¶¶ 97-102. Plaintiff's NIED claim is grounded in Defendants' egregious conduct following the tragic death of her son and the Amended Complaint describes a pattern of callous, obstructive, and dismissive conduct by Defendants in the aftermath of a traumatic death that displayed an utter disregard for the dignity of the deceased and surviving mother. Accepting these allegations as true and drawing all reasonable inferences in Plaintiff's favor, which this Court must do, whether Defendants' egregious post-mortem misconduct and intentional concealment constitutes negligent infliction of emotional distress requires resolution before a jury.

The cases on which Defendants rely to argue that Plaintiff's allegations cannot support a NIED claim are readily distinguishable. *Cf.* Def. Mot., Section II (A); *see Kmiotek v. Sachem Cent.*

*School Dist.*, 176 A.D.3d 1063 (2d Dep't 2019) (dismissing claim brought by non-immediate family member students where, unlike here, the alleged misconduct consisted of the denial of counseling after witnessing a classmate's death); *Campoverde v. Sony Pictures Ent., Inc.*, 2002 WL 31163804, at *14 (S.D.N.Y. Sept. 30, 2002) (dismissing claim brought by prospective talk show guests where, unlike here, alleged misconduct consisted of a show producer and her assistant verbally harassing plaintiffs after plaintiffs refused to sign contracts, as well as security guards keeping plaintiffs within a waiting room and ultimately "back[ing]" plaintiffs out of the studio and into the street); *Carney v. Boston Market*, 2018 WL 6698444, at *4 (S.D.N.Y. Dec. 20, 2018) (dismissing claim where, unlike here, the plaintiff alleged emotional harm from finding what appeared to be a baby bird's head in her take-out meal). The accidental nature of the event in *Carney* bears no resemblance to the grave, intentional, and repeated conduct alleged in the Amended Complaint, and this case, as described, involves an inherently different and more sensitive context than the cases cited by Defendants. *See* Am. Compl., ¶¶ 97-102. Plaintiff alleges "extreme and outrageous" conduct on the part of any of the Defendants, setting forth a sustained pattern of egregious, wanton, and reckless conduct in the wake of John's death. These actions rise to the level of extreme and outrageous conduct, reflecting a deliberate and callous disregard for Plaintiff's emotional well-being at the moment of her greatest vulnerability: the sudden, violent, and preventable loss of her son. At a minimum, whether such conduct is sufficiently extreme and outrageous is a quintessential question of fact that must be resolved by a jury.

Further, Plaintiff's allegations satisfy theories required to bring a NIED claim. *See Beter*, 2024 WL 4252036, at *7; *see also Carney*, 2018 WL 6698444, at *4; *cf.* Def. Mot., Section II (B). "Special circumstances" cases, for example, include misinforming a plaintiff of the death of a loved one, falsely informing a plaintiff of a serious medical diagnosis, "and other instances of

comparable gravitas." *See Carney*, 2018 WL 6698444, at *4. Here, given the severity and context of the allegations, Plaintiff has more than plausibly alleged conduct that a reasonable jury could find creates a "special circumstances" case.

In sum, Defendants improperly demand proof rather than plausibility. On a Rule 12(b)(6) motion, the question is not whether Plaintiff will ultimately prevail, but whether she has pleaded sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678. Plaintiff has done so here. Accordingly, the Court should not dismiss Plaintiff's adequately pleaded negligent infliction of emotional distress claim.

## III.    The Amended Complaint States a Plausible Claim for Tortious Interference with Contract

The Amended Complaint sufficiently states a claim for tortious interference with contract. To state a tortious interference with contract claim under New York law, Plaintiff must allege: (1) the existence of a valid contract between the plaintiff and a third party, (2) defendant's knowledge of that contract, (3) defendant's intentional procurement of the third-party's breach of the contract without justification, (4) actual breach of the contract, and (5) damages resulting therefrom. *See Symquest Group, Inc. v. Canon U.S.A., Inc.*, 186 F. Supp. 3d 257, 266 (E.D.N.Y. 2016).

The allegations in the Amended Complaint satisfy these elements. As detailed in Amended Complaint, Plaintiff (individually and/or on behalf of the Estate of John) was an insured and/or beneficiary under one or more of the insurance policies referenced and, potentially, under other policies that have not been disclosed. *See* Am. Compl., ¶ 104. Plaintiff had a right to recover insurance proceeds under the various insurance policies, which are valid contracts, believed to have collective limits exceeding $10 million, and Defendants had knowledge of the insurance policies and of Plaintiff's rights thereunder. *See* Am. Compl., ¶¶ 105-106. Defendants intentionally interfered with Plaintiff's rights under the policies by submitting insufficient claims, failing to

dispute the rejection of those claims by the insurance broker, refusing to provide Plaintiff with unredacted copies of the policies in place, or to even identify all of the potentially applicable policies, and otherwise refusing to assist in the pursuit of insurance claims arising from John's murder inside the Townhouse. *See* Am. Compl., ¶ 107.

Defendants' interference was without justification, seeking only to protect their own interests, and to the detriment of the rights of Plaintiff. *See* Am. Compl., ¶ 109. As a direct and proximate result of said tortious interference with contract, Plaintiff sustained compensatory damages. *See* Am. Compl., ¶ 110. Accepting these allegations as true and drawing all reasonable inferences, Plaintiff has adequately pleaded a tortious interference with contract claim.

Plaintiff has standing to assert the tortious interference claim. *See Debary v. Harrah's Operating Co., Inc.*, 465 F. Supp. 2d 250, 253 (S.D.N.Y. 2006), *aff'd sub nom. Catskill Dev., L.L.C. v. Park Place Entertainment Corp.*, 547 F.3d 115 (2d Cir. 2008) (holding New York law permits recovery by third-party beneficiaries for tortious interference with contract). Contrary to Defendants' assertions, Plaintiff has specifically alleged that she and/or John were an insured and/or beneficiary under one or more of the insurance policies referenced in the Amended Complaint and, potentially, under other policies that have not been disclosed. *See* Am. Compl., ¶ 104; *cf.* Def. Mot., Section III (A). Defendants continue to withhold the relevant policies from Plaintiffs and have not included any of them in the papers on this motion.

Moreover, Plaintiff has alleged interference and resulting injury. The Amended Complaint states that Plaintiff had a right to recover insurance proceeds under the various insurance policies, which are valid contracts, believed to have collective limits exceeding $10 million, and Defendants had knowledge of the insurance policies and of Plaintiff's rights thereunder. *See* Am. Compl., ¶¶ 105-106. Among other things, Plaintiff has specifically alleged that Defendants intentionally

interfered with Plaintiff's rights under the policies by submitting insufficient claims, failing to dispute the rejection of those claims by the insurance broker, intentionally withholding and refusing to provide Plaintiff with documentation necessary for coverage determination and/or unredacted copies of the policies in place, or to even identify all of the potentially applicable policies, and otherwise refusing to assist in the pursuit of insurance claims arising from John's murder inside the Townhouse. *See* Am. Compl., ¶ 107; *cf.* Def. Mot., Section III (C). Particularly, at the pleading stage, Plaintiff need not prove coverage under the policies—she needs only to plausibly allege that valid contracts existed, that she or John was a beneficiary of those contracts, and that Defendants interfered with Plaintiff's ability to realize the benefits. The Amended Complaint does exactly that. *See* Am. Compl. ¶¶ 68-81; 104-110.

Moreover, Defendants' reliance on policy exclusions to argue Plaintiff is not an intended beneficiary improperly asks this Court to resolve factual disputes about the scope of insurance coverage, where the policies are not even available for the Plaintiff or the Court to review. Plaintiffs allege that Defendants obstructed their ability even to review the relevant policies *See* Am. Compl. ¶¶ 70-81. Defendants cannot invoke purported exclusions while simultaneously refusing to provide the operative contracts.

Additionally, despite Defendants' claims to the contrary, Defendants were not all parties to the insurance contracts with which they interfered. *See* Am. Compl., ¶ 108; *cf.* Def. Mot., Section III (B). For example, Employers has a policy with ACLJ. *See id.* To the extent Plaintiff's rights under that contract were interfered with by Defendants CASE, 34 LLC, Jay Sekulow and/or Jordan Sekulow, those Defendants, who were not parties to the Employers policy, would be liable for tortious interference. *See id.* Similarly, Munich Re has a policy with CASE. *See id.* To the extent Plaintiff's rights under that contract were interfered with by Defendants ACLJ, 34 LLC, Jay

Sekulow and/or Jordan Sekulow, those Defendants, who were not parties to the Munich Re policy, would be liable for tortious interference. *See id.* Given multiple insurance policies covering different parties, the conduct of Defendants constitutes actionable tortious interference of one or more of each such policy. *See id.*

In sum, Defendants seek a Kafkaesque result, asking the Court to bar Plaintiff's tortious interference claims on the basis of policies it refuses to disclose or produce. Given there are plainly identifiable facts that exist but cannot be stated absent discovery, dismissal would be premature and unjust. Again, on a Fed. R. Civ. P. Rule 12(b)(6) motion, the question is not whether Plaintiff will ultimately prevail, but whether she has pleaded sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678. Plaintiff has done so here. *See* Am. Compl. ¶¶ 68-81; 104-110. That is all that is required at this stage. Accordingly, the Court should not dismiss Plaintiff's adequately pleaded tortious interference with contract claim.

## IV.    The Amended Complaint States a Plausible Claim for Defamation

### A.  New York's Anti-SLAPP Law Does Not Bar Plaintiff's Defamation Claim

Defendants' invocation of New York's anti-SLAPP statute is improper. Under New York law, a defendant in an action involving public petition and participation—*i.e.*, any communication in a place open to the public or a public forum in connection with an issue of public interest; or any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition—may maintain an action, claim, cross claim or counterclaim to recover damages, including costs and attorney's fees, from any person who commenced or continued such action; provided that: costs and attorney's fees shall be recovered upon a demonstration "that the action involving public petition and participation was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension,

modification or reversal of existing law;" and other compensatory damages and punitive damages may only be recovered upon an additional demonstration that the action involving public petition and participation was commenced or continued for the purpose of "harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights." *See* N.Y. Civ. Rights Law § 70-a (1)(a)-(c); *see also* N.Y. Civ. Rights Law § 76-a.

Plaintiff's claim does not involve a "communication in a place open to the public or a public forum in connection with an issue of public interest," or Defendants' mere "exercise of the constitutional right free speech in connection with an issue of public interest" or "in furtherance of the exercise of the constitutional right of petition." *See* N.Y. Civ. Rights Law § 76-a. Defendants' reliance on *Bobulinski v. Tarlov* is misplaced, as that case involved statements made by a commentator on a major cable news network about a congressional witness' law firm having been paid by a specific political action committee during an impeachment investigation into a sitting president. 758 F. Supp. 3d 166, 171 (S.D.N.Y. 2024).

The issue here is not a matter of political speech. Plaintiff's defamation claim involves explicit, intentional, and false statements made to and published by *The Independent* and *Newsweek*—British and American outlets, respectively, with broad readership—falsely declaring that Plaintiff's lawsuit was "demonstrably untrue." *See* Am. Compl. ¶ 114. These statements were not part of court filings or judicial proceedings, where privilege might apply, but were instead injected into the media for the express purpose of branding Plaintiff a liar and undermining her credibility before discovery could even proceed. *See* Am. Compl. ¶¶ 116–120. As specified by Plaintiff, because the statements were made to the press, and not in the lawsuit itself, they are not shielded by absolute privilege or even by a qualified privilege. *See* Am. Compl. ¶ 120. Even if the statements were deemed to be potentially covered by a qualified privilege, they were made with

knowledge of falsity or with reckless disregard of the truth, as Defendants know that the allegations in the initial complaint were factually accurate. *Id*. The anti-SLAPP law does not immunize knowingly false statements designed to intimidate or humiliate a litigant, and, as shown below, Plaintiff has also demonstrated that her defamation claim has a substantial basis.[2]

### B.  Plaintiff Alleges Actionable Defamation

The Amended Complaint sufficiently states a claim for defamation. To state a defamation claim under New York law, Plaintiff must allege: (1) the defendant published a defamatory statement of fact to a third party, (2) the statement of fact was false, (3) the false statement of fact was made with the applicable level of fault, and (4) either the false statement was defamatory per se or caused the plaintiff special harm. *See Kamdem-Ouaffo v Balchem Corp*., 2018 WL 4386092, at *19 (S.D.N.Y. Sept. 14, 2018).

The allegations in the Amended Complaint satisfy these elements. Defendants' counsel told two major publications that "the complaint's allegations against our client are demonstrably untrue, which will become clear as the case proceeds." *See* Am. Compl. ¶ 114. On information and belief, counsel for Defendants was authorized to make these statements on their behalf. *See* Am. Compl. ¶ 115. The statements clearly refer to Plaintiff (individually), as she is the living Plaintiff who brought the lawsuit. *See* Am. Compl. ¶ 116. Plaintiff further alleges the statements were false when made, as the allegations in the initial complaint were indeed true. *See* Am. Compl. ¶ 117. The Amended Complaint also alleges that the statements on behalf of Defendants were intended to and do paint Linda as a liar, to communicate that message broadly, and to pressure her to drop the lawsuit, and that calling someone a liar and asserting that they have filed false claims in the

---

[2] At minimum, whether Plaintiff's defamation claim has a "substantial basis in fact and law" (or "was commenced or continued for the purpose of "harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights") is a fact-intensive inquiry inappropriate for resolution on a motion to dismiss.

courts in an effort to obtain money constitutes defamation per se. *See* Am. Compl. ¶¶ 117-118. While counsel publicly stated that the supposed untruth of the allegations would "become clear as the case proceeds," Defendants instead seek to dismiss this case before the facts can be fully discovered, explored, and vetted in this lawsuit. Defendants have no intention of making anything clear. *See* Am. Compl. ¶ 119. Accepting these allegations as true and drawing all reasonable inferences, Plaintiff has adequately pleaded a defamation claim.

Defendants wrongly argue the statements cannot be attributed to them because they were made by their attorneys, and, yet again, cite to an inapposite case to support their argument. *See Sprecher v. Thibodeau*, 148 A.D.3d 654, 655 (1st Dep't 2017) (holding that defamation claim is time-barred and "***[t]he tortious interference claim*** [(not defamation claim)] was properly sustained insofar as it was premised on emails sent by defendant to a key investor, but not insofar as it was premised on comments made by defendant's attorney that were quoted in various news articles." (emphasis added)). Rather, New York law establishes that a person who authorizes others to speak on their behalf can be held vicariously liable for defamatory statements made by their agents, which include attorneys. *See Gottwald v. Sebert*, 193 A.D.3d 573 (1st Dep't 2021) (holding that a singer was liable for defamatory statements made by her lawyer because the lawyer was acting as her agent). Here, Plaintiff expressly alleges that counsel for Defendants was authorized to make the defamatory statements on their behalf. *See* Am. Compl. ¶ 115.

Moreover, the defamatory statements at issue are not, as Defendants contend, "quintessential opinions that are exempted from defamation claims." They are categorical assertions of falsity, presented as statements of fact, which are capable of being proven true or false. *See Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995). In other words, statements that Plaintiffs' allegations are "demonstrably untrue" are verifiable factual assertions, not opinion. Defendants'

citation to *Sprecher v. Thibodeau* is off point, as the case neither supports nor stands for the proposition Defendants claim. 148 A.D.3d at 656-57 ("Such comments [(accusing the plaintiff of being complicit in a fraudulent scheme)] are thus not wrongful in the manner required to support a tortious interference claim."). Likewise, Defendants' reliance on *Shawe v. Kramer Levin Naftalis & Frankel LLP* is inapposite, as the statements there involved mere "predictions as to what 'appeared to be' or 'might well be' or 'could well happen' or 'should be' [which] would not have been viewed by the average reader…as conveying actual facts about plaintiff". 2018 WL 984833, at *9 (N.Y. Sup. Ct. Feb. 16, 2018). Defendants' reliance on *600 W. 115th St. Corp. v Von Gutfeld* is also misguided, as that case focused on the figurative term "smells of." 80 N.Y.2d 130, 143 (1992).

Here, by contrast, Defendants' counsel flatly made a clear and pure assertion of fact, stating that Plaintiff's allegations are "demonstrably untrue, which will become clear as the case proceeds." Am. Compl. ¶ 114. Unlike vague predictions or rhetorical hyperbole, which are not typically actionable, Defendants' statements claim access to facts demonstrating falsity and present assertions as verifiable truth. Unlike any of the cases on which Defendants rely, the statements here make direct, factual assertions capable of being proven true or false, and are, thus, actionable false statements.

Indeed, there is authority that labeling someone a liar and/or having lied about the allegations in a lawsuit against a defendant constitutes defamation. *See Zervos v Trump*, 171 A.D.3d 110, 111, 128-29 (1st Dep't 2019) (denying motion to dismiss defamation claim and holding "Defendant's denial of plaintiff's allegations was susceptible of being proved true or false, since he either did or did not engage in the alleged behavior. While a denial, which is a statement of purported fact and not mere opinion, does not always provide a basis for a defamation claim, *a*

***denial coupled with the claim that the accuser is or will be proved a liar, impugns a person's
character as dishonest or immoral and typically crosses the line from nonactionable general
denial to a specific factual statement about another that is reasonably susceptible of defamatory
meaning***. […] [D]efendant's flat-out denial of a provable, specific allegation against him
concerning his own conduct, accompanied by a claim that the accuser was lying, could not be
viewed even in that context as a rhetorical statement of pure opinion or as vague, subjective, and
lacking in precise meaning." (emphasis added)).

Lastly, Plaintiff has pleaded the applicable level of fault. Plaintiff alleges the statements
were false when made, as the allegations in the initial complaint were indeed true. *See* Am. Compl.
¶ 117. Defendants were fully aware of the truth of Plaintiff's allegations in the initial complaint —
indeed, they possessed superior knowledge of the very events at issue—yet deliberately branded
Plaintiff's allegations as "demonstrably untrue." At a minimum, this plausibly pleads actual
malice. The Amended Complaint also alleges that the statements on behalf of Defendants were
intended to and do paint Linda as a liar, to communicate that message broadly, and to pressure her
to drop the lawsuit, and that calling someone a liar and asserting that they have filed false claims
in the courts in an effort to obtain money constitutes defamation per se. *See* Am. Compl. ¶¶ 117-
118. One of the recognized categories of defamation per se is a false statement charging the
plaintiff with a serious crime. *See Albert v. Loksen*, 239 F3d 256, 271 (2d Cir. 2001). Under New
York Penal Law § 175.35, a person is guilty of offering a false instrument for filing in the first
degree when, knowing that a written instrument contains a false statement or false information,
and with intent to defraud the state or any political subdivision, public authority or public benefit
corporation of the state, he or she offers or presents it to a public office, public servant, public
authority or public benefit corporation with the knowledge or belief that it will be filed with,

registered or recorded in or otherwise become a part of the records of such public office, public servant, public authority or public benefit corporation. N.Y. Penal Law § 175.35. Therefore, a false accusation of offering a false instrument for filing could fall within this category.

While Defendants publicly promised that the alleged "untruth" of Plaintiff's allegations would "become clear as the case proceeds," they never intended to vindicate the truth but rather to smear Plaintiff's credibility. At the pleading stage, however, Plaintiff's only obstacle is the plausibility standard of *Twombly* and *Iqbal*. *See Palin v. New York Times Co*., 940 F.3d 804, 817 (2d Cir. 2019). Again, the question is not whether Plaintiff will ultimately prevail, but whether she has pleaded sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678. Plaintiff has done so here. *See* Am. Compl. ¶¶ 113-123. That is all that is required at this stage. Accordingly, the Court should not dismiss Plaintiff's adequately pleaded defamation claim.

## V.      **Defendants' Motion to Strike Should Also Be Denied**

Motions to strike are viewed with disfavor and infrequently granted. *Berryman v. Reading Intl., Inc*., 763 F. Supp. 3d 596, 607 (S.D.N.Y. 2025). Regardless, Defendants have utterly failed to demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." *See Impulsive Music v. Pomodoro Grill, Inc.*, 2008 WL 4998474, at *2 (W.D.N.Y. Nov. 19, 2008).

The allegations Defendants seek to strike are not "redundant, immaterial, impertinent, or scandalous." *See* Fed. R. Civ. P. Rule 12(f). Rather, the allegations Defendants seek to strike go to the very heart of Plaintiff's claims and document a disturbing sequence of post-death concealment and obfuscation. *See* Am. Compl., ¶¶ 39, 42, 60, 61, 98. Far from gratuitous, these facts, as shown above and as alleged within the Amended Complaint, speak directly to Defendants' intent and

pattern of behavior in the aftermath of a traumatic death that, among other things, exacerbated emotional suffering, and they provide necessary factual context for Plaintiff's negligent infliction of emotional distress and tortious interference with contract claims.

In short, striking these allegations would improperly deprive Plaintiff of the ability to present the full story of Defendants' misconduct, which includes not only their initial negligence but also their pattern of callous, obstructive, and shameful post-mortem misconduct. To strip these allegations from the pleading would unfairly sanitize the record and obscure critical facts central to the trier of fact's evaluation of Plaintiff's claims. Accordingly, paragraphs 39, 42, 60, 61, and 98 of the Amended Complaint should not be stricken pursuant to Fed. R. Civ. P. Rule 12(f).

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that this Court: (i) deny Defendants' Motion in its entirety; and (ii) grant Plaintiff such other and further relief as this Court deems just and proper.

Dated: New York, New York
      October 2, 2025

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Plaintiff*

By: _____
    Richard C. Schoenstein
    1350 Broadway
    New York, New York 10018
    Tel.: (212) 216-1139
    Facsimile: (212) 216-8001
    Email: rschoenstein@tarterkrinsky.com

## CERTIFICATION OF SERVICE

I hereby certify that on October 2, 2025, a copy of the foregoing was served via the Court's

ECF system on all parties of record.

_____
                        Richard C. Schoenstein

## CERTIFICATION OF COMPLIANCE

I hereby certify that the foregoing "Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Failure to State a Claim and to Strike Allegations from the Amended Complaint" complies with Rule 7.1(c) of the Local Rules of United States District Courts for the Southern and Eastern Districts of New York. This memorandum of law was prepared using Microsoft Word, with Times New Roman typeface. The main body of the memorandum of law is in 12-point font. The memorandum of law contains 8,550 words as calculated by the word-processing system used to prepare the document, exclusive of the caption, table of contents, table of authorities, and signature block.

Dated: New York, New York
        October 2, 2025

_____
                Richard C. Schoenstein